## McGrorey Estate

*M. Paul Smith*, of *Smith, Aker, Grossman, Hollinger & Jenkins*, for accountant.
*John J. O'Brien*, for late minor.

TAXIS, *P.J.*, December 31, 1975—The first and final account of the Continental Bank, guardian of the estate of Claire M. McGrorey, a minor, was audited by the court on June 16 and 17, 1975.

The account shows a balance of principal and income for distribution of $141,288.40, composed of securities, as stated on page 2 of the account, $140,732.27, and cash.

By letter dated April 23, 1975, to the clerk of the Orphans' Court, counsel for the Board of Assessment Appeals requested that the claim of the Board of Assessment Appeals be removed and such claim is accordingly dismissed.

Objections to the account were filed on behalf of Claire McGrorey ("Claire") and hearing was held thereon on June 16 and 17, 1975. Claire requests that the court surcharge accountant in an amount in excess of $40,000, the loss in value of stock between the dates of purchase of the stock by accountant and the date of distribution of the stock to Claire.

On July 24, 1972, by compromise settlement of a lawsuit arising out of a motor vehicle accident, Claire became entitled to receive $145,231.61. Claire was then 19 years of age, having been born on June 21, 1953. On October 5, 1972, accountant was appointed guardian of the estate of Claire M. McGrorey, a minor, to receive the settlement money for Claire.

In April, May and September 1973, accountant made purchases of the common stock of American Brands, Exxon, IBM and Western Union and the total purchase price of such purchases was $86,732.27. These stocks were ultimately distributed in kind to Claire on October 4, 1974, at which time their total market value was $45,863.75. Claire seeks to surcharge accountant in the sum of $40,868.52, the difference between the purchase price of these stocks and their market value at the time of distribution.

It is Claire's position that accountant's investment in common stocks in April, May and September 1973, was improper because as of December 6, 1972, objector was, by virtue of Act of December 6, 1972, P.L. 1017 (No. 300), as amended 12 P.S. §140 (effective December 6, 1972), an adult, and accountant should have so notified Claire and returned to her the assets of her estate; that even if Claire was not an adult until she became 21 on June 21, 1974, accountant invested in common stock improperly because the guardianship was short term and the common stock investments were designed for permanent or long-term investment, for which accountant had no authorization; and that accountant acted improperly in delaying distribution of the common stock to Claire from June 21, 1974, to October 4, 1974, resulting in a loss in value during that period of $10,825.25.

Act No. 300 became effective December 6, 1972, and provides that, "except where otherwise provided by law, a person 18 years of age and older shall be deemed an adult and may sue and be sued as such." The Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508 (No. 164), 20 Pa.

C.S.A. §101 et seq., was amended by Act No. 331, effective February 5, 1973, to reduce requirements from 21 years to 18 years for purposes of the code. And where a minor with a court-appointed guardian became 18 years of age prior to these acts, the Orphans' Court of Somerset County terminated her guardianship after the effective date of these acts and directed distribution to her even though she had not yet reached the age of 21: Zimmerman Estate, 23 Fiduc. Rep. 623, 28 Somerset 145 (1973). However, the court in Zimmerman Estate was required to consider the guardian's position that because the law considered any person under the age of 21 to be a minor at the time the guardianship was created, the law, therefore, required the person to attain the age of 21 before termination of the guardianship, notwithstanding interim legislation defining a minor as an individual under the age of 18 years. Id., at 625.

The question of whether the McGrorey guardianship terminated on December 6, 1972, or February 5, 1973, is a legal question. On November 17, 1972, accountant had written to its counsel (who was also Claire's legal counsel) for advice as to the nature of accountant's investments until Claire should be 21. And in October 1973, after all the investments in question were made, counsel prepared a release and indemnity agreement to permit Claire to withdraw $20,000 for alterations to her home. In addition, the question of the effect of the legislation reducing the age of majority to 18 had been discussed with Claire and her parents, as when Claire had a will prepared for her by her counsel. Also, accountant's policy prior to June 1974 had been not to terminate guardianships at age 18 and this policy was adopted on the advice of accountant's general

counsel. In these circumstances, Claire being represented by counsel and having the right to petition for the termination of the guardianship, as in Zimmerman Estate, supra, and accountant relying on the advice of counsel, the court rejects Claire's argument that accountant, promptly after December 6, 1972, or February 5, 1973, should have notified Claire that she was an adult and should have then returned to her the assets of her estate. Cf. Luria Trust, 19 Fiduc. Rep. 90, 45 D. & C. 2d 749 (1968).

We turn now to Claire's contention that accountant invested in common stock improperly because the guardianship was short term and the common-stock investments were designed for permanent or long-term investment.

A guardian of a minor may invest in common stock if purchased in the exercise of that degree of judgment and care, in the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital: PEF Code, supra, secs. 5145, 7302, 7310, 20 Pa. C.S.A. §§5145, 7302, 7310. The handling of these investments by accountant must be evaluated in the light of accountant's superior skill: Killey Trust, 457 Pa. 474, 326 A. 2d 372 (1974). However, Claire has the burden of proving the particulars of accountant's wrongful conduct.

On November 17, 1972, Mr. Albracht, the assistant trust officer who handled this account, wrote to counsel for accountant, who had also acted as counsel for Claire and her parents, questioning the advisability of investing in common stocks. By let-

ter dated November 21, 1972, counsel replied, in part, as follows:

"I would not be reluctant to invest in common stocks, provided the letter you mentioned is received from Miss McGrorey requesting investments of a more permanent nature be considered. While the guardianship will terminate at majority, and the bank will be discharged after accounting to the Court, there is no reason why whatever stocks or other investments are held could not be transferred to Miss McGrorey's individual name at that time. Indeed, the bank might well continue the investment program for her, assuming this is what she wishes to be done."

By letter dated November 24, 1972, Mr. Albracht wrote to Mr. and Mrs. McGrorey as follows:

"I have had some correspondence with the law firm of Obermayer, Rebmann, Maxwell & Hippel regarding the advisability of making investments of a permanent nature for your daughter, Claire. I was somewhat reluctant to allow our Investment Department to make recommendations of a permanent nature in this account as your daughter will become 21 in about 1½ years. However, Mr. Richards of the above law firm has indicated to me that if your daughter were to request our considering investments of a permanent nature, such as common stocks and corporate bonds, we would be happy to do so. If, however, she feels she wishes to receive only cash at age 21, our Investment Department would not make permanent investment recommendations.

"I would request that this letter be shown to your daughter, and would also request that she affix her signature to the enclosed carbon indicating her preference."

Claire signed a postscript to this letter which stated: "I wish to receive recommendations of securities for permanent investment." The alternative postscript, which Claire did not sign, read: "I wish to receive only cash at age 21 and hence wish no investments of a permanent nature." The letter was returned to Mr. Albracht, who then gave a copy of the letter to Mr. Preston, the trust investment officer handling this account, and requested that Mr. Preston contact the McGroreys.

Mr. Preston has been a trust investment officer for four years, prior to which he was in the investment business, with a brokerage firm, since 1960. He made the investment decisions in this account after consulting with Claire and her parents in order to determine their needs and their objectives.

On December 7, 1972, Mr. Preston wrote to the McGroreys and suggested that a meeting be held to discuss investments for the account. In March 1973, after receiving a telephone call from Mr. McGrorey, who outlined what they were looking for, Mr. Preston supplied specific recommendations as to a suggested portfolio, which included investments in IBM, Eastman Kodak, Exxon and Fidelity Investors, and which showed a projected annual income of $6,292. The cost of the recommended securities was indicated as $144,850.

At a meeting at the McGrorey's home in April 1973, Claire and her parents indicated to Mr. Preston that approximately $6,000 per year would be sufficient to meet Claire's current needs. Mr. Preston explained to Claire and her parents that with a growth investment, one looks for long-term performance, but that income on such an investment is not as great as on an income-producing security. Mr. Preston was told by Claire and her parents that they were mainly interested in the growth of

Claire's account and that her financial needs were being met by Mr. McGrorey.

There was also discussion in April 1973 between accountant and the McGrorey family regarding establishing a trust for Claire after the guardianship terminated, and it was indicated at the McGrorey home in April 1973 that accountant would probably be acting on a long-term basis and that Mr. Preston would be contacting Claire concerning her investment account.

Subsequently, in April or May 1973, Mr. Preston advised Claire by telephone that he was changing his recommendations by substituting General Electric for Eastman Kodak and Western Union for Fidelity Investors. Claire said that accountant was the expert and she would rely upon accountant.

On August 1, 1973, Mrs. McGrorey called Mr. Albracht and indicated that money would be needed for home renovations. In this conversation, Mrs. McGrorey was advised that Claire's account was invested in securities, and the various securities, the number of shares and the cost of the securities were read to her. Mr. Albracht again discussed the investments with *Mr*. McGrorey about one week later.

In August or September 1973, Mr. Preston received a memorandum from accountant's counsel, who was then acting as attorney for the McGroreys, requesting cash to construct an addition to the McGrorey house. Accountant sold Fidelity Corporation stock at about September 1973 for that purpose.

In November 1973, Claire called Mr. Preston wanting to know what stock she had and what was in her account. In that conversation, Mr. Preston advised Claire that accountant was going to sell

General Electric and this was confirmed by letter. Also in November 1973, Claire received a statement of account listing every transaction in this account from the inception of the guardianship to November 15, 1973, and listing the holdings of the account as of November 15, 1973. And on December 6, 1973, Mr. Preston forwarded to Claire an investment analysis, again listing the holdings of the account, their carrying value, market price, market value, annual rate, estimated annual income and yield at market value.

The record establishes, therefore, that accountant acted properly in investing in common stocks which would satisfy (1) the income needs of Claire, and (2) her and her parents' objective of growth in her account on a long-term basis. The record establishes that Claire and her parents expected a long-term investment program and knew of the investment in common stocks. In fact, Claire conceded that on or about October 5 or 6, 1974, when she received the cash, she could not believe that she received cash because she thought her account was a long-term investment, rather than merely until she reached the age of 21.

As to the prudence of the *selection* of the investments for the account, Mr. Preston was restricted to the bank's approved list of investments. The bank compiled this list through a committee system. A trust investment committee had bi-weekly research meetings and all portfolio managers attended these meetings. The researchers were investment security analysts employed by the trust department, whose primary responsibility was to monitor the trust department equities, to recommend changes as conditions warrant, and to update periodically the various data and conclusions

concerning accountant's approved list. Research sources included not only accountant's own sources, but also outside advisors such as prominent brokerage firms, a paid trust investment department of a major money-center bank, and numerous periodicals, statistical and economic, subscribed to by accountant's trust department. Using this information, the researchers arrived at conclusions concerning the general economic outlook for the succeeding 12 months and attempted to isolate industries which looked particularly good from a common-stock standpoint, within that economic outlook. Once they determined an industry was worthy of investment, they then attempted to isolate at least one, if not more, securities representative of that industry. The portfolio managers then questioned and probed to determine whether comprehensive information had been received and, having been first satisfied of that, they added the security, or deleted it, from accountant's approved list, and the list was then forwarded for verification by the trust committee of the board of directors.

The trust committee of the board of directors during the period in question in this matter consisted of men in the fields of banking, particularly the trust department field, business and law. The committee also included a former assistant Secretary of Banking in Pennsylvania, who was, during the period in question, an instructor at Wharton and a member-at-large of the Banking Board of Pennsylvania. This committee had to be convinced of the relative wisdom of the recommendations of the trust investment committee, which, if ratified by the trust committee of the board of directors, became the operating requirements for the portfolio managers to operate within.

In addition to the procedures for security selection, accountant had also a committee for investment review and its function was to look on an account-by-account basis at every trust account. Each account was reviewed more frequently than the once-a-year legal requirement, and each portfolio manager was asked to justify the condition of the portfolio. Any final recommendations of the committee then went to the trust committee of the board of directors and, with its approval, the change in the portfolio was made.

With regard to the McGrorey investments, all were subjected to this research and procedure. All were on accountant's approved list. In the circumstances prevailing from October 5, 1972, to October 4, 1974, accountant acted prudently, discreetly, and intelligently in the management of Claire's account, not in regard to speculation, but in regard to the permanent disposition of Claire's funds, considering the probable income to be derived therefrom as well as the probable safety of the capital. Accountant acted prudently, discreetly and intelligently in the management of this account, evaluated in the light of accountant's superior skill.

With regard to the argument by Claire's counsel that accountant acted improperly in delaying distribution of the common stock to Claire from June 21, 1974, to October 4, 1974, the record establishes that there was no undue delay in making distribution to Claire. The account was prepared, reviewed by counsel, and forwarded to Claire by July 30, 1974. Mr. Albracht wrote to Claire again on August 22nd, requesting that she take action with regard to the approval of the account. The receipt and release was signed by Claire on August 23rd, and was returned to accountant, whereupon accountant proceeded to reregister the securities for distribution to

Claire. The securities and cash were then distributed to Claire by letter dated October 4, 1974. If accountant had elected to file a court accounting, the earliest possible audit after June 21, 1974, was September 3, 1974. Even assuming a routine audit, a prompt adjudication, the lapse of ten days from the date of the adjudication for the adjudication to be confirmed absolutely, and a prompt re-registration of the securities, it would have been virtually impossible to distribute the securities to Claire before October 4, 1974. Again, Claire has failed to carry the burden of proving wrongful conduct by accountant.

In addition to the foregoing, on August 23, 1974, Claire executed the receipt and release which had been forwarded to her by accountant, along with a copy of the accounting. While Claire's counsel argued vigorously that Claire was misled because the account listed the assets at account value, rather than market value, the record establishes that there was no intention to mislead on the part of accountant. Furthermore, Claire, upon receipt of the account, did try to determine the value of the securities listed in the account and discovered that the value of the securities was $40,000 less than the purchase price of the securities. In addition, the investment analysis forwarded to Claire in December 1973 indicated carrying values *and* market values, and the totals at that time indicated a loss of over $15,000 between carrying value and market value. In light of the court's conclusion, however, that Claire has failed to carry the burden of proving any wrongful conduct by accountant, it is not necessary for the court to determine the binding effect of the execution by Claire of the receipt and release.

The objector having failed to carry the burden of proving the particulars of any wrongful conduct by accountant, all of the objections are dismissed.

Subject to the views expressed in this adjudication and subject to distributions heretofore properly made, the balances of principal and income are awarded to Claire M. McGrorey.

The account is confirmed, and it is hereby ordered and decreed that Continental Bank, guardian of the estate of Claire M. McGrorey, a minor, as aforesaid, forthwith pay the distributions herein awarded.

And now, December 31, 1975, this adjudication is confirmed nisi.